Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | WILLIAM T. HART | SITTING JUDGE IF OTHER THAN ASSIGNED JUDGE | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 1688 | **DATE** | JUNE 19, 2003 |
| **CASE TITLE** | MORRIS SILVERMAN MANAGEMENT CORPORATION v. WESTERN UNION FINANCIAL SERVICES, INC. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Defendant-counterplaintiff's motion for summary judgment [54] is denied. Plaintiff-counterdefendant's motion for summary judgment [66] is granted in part and denied in part. Second Amended Counterclaim Counts I, II, and III, and Count IV(B) (except for the claim based on § 8(A)(iii) of the parties' agreement) are dismissed. Status hearing set for July 23, 2003 at 11:00 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| ✓ | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

cw   courtroom deputy's initials

5 number of notices

JUN 20 2003
date docketed

docketing deputy initials

6/19/2003
date mailed notice

mgm
mailing initials

Document Number

87

U.S. DISTRICT COURT
CLERK
03 JUN 19 PM 4:47
FILED-ED 10

Date/time received in central Clerk's Office



DOCKETED

JUN 2 0 2003

MORRIS SILVERMAN MANAGEMENT )
CORPORATION,                  )
                              )
          Plaintiff,          )
          Counterdefendant,   )
                              )
     v.                       )          No. 01 C 1688
                              )
WESTERN UNION FINANCIAL SERVICES, )
INC.,                         )
                              )
          Defendant,          )
          Counterplaintiff.   )

## MEMORANDUM OPINION AND ORDER

### I. BACKGROUND

This case centers around the dissolution of a
relationship between plaintiff-counterdefendant Morris Silverman
Management Corporation ("MSMC") and defendant-counterplaintiff
Western Union Financial Services, Inc. ("Western Union"). MSMC
owns and operates numerous currency exchanges, check cashing
facilities, and payday loan centers at various locations in the
United States. During the late 1990's, it operated up to 200
locations. For more than 25 years, MSMC offered Western Union
wire transfer and other services at those locations. Other non-
Western-Union services are also offered at each location. The



last contract under which MSMC offered Western Union services expired June 28, 2001. The present case centers on the termination of the parties' relationship and the last few years before termination.

Diversity jurisdiction is proper in that MSMC is an Illinois corporation with it principal place of business in Illinois and Western Union is a Colorado corporation with its principal place of business in Colorado. The amount in controversy is well in excess of $75,000. The parties agree that, under a choice of law provision of the parties' contract, New Jersey law applies to the contract claims between the parties. Because the parties present no choice-of-law arguments regarding the noncontract claims, generally cite to Illinois law regarding these claims, and do not contend there is any applicable law that is different than Illinois law, Illinois law will be applied in resolving the noncontract claims. See Massachusetts Bay Insurance Co. v. Vic Koenig Leasing, Inc., 136 F.3d 1116, 1120 (7th Cir. 1998); Wood v. Mid-Valley, Inc., 942 F.2d 425, 426-27 (7th Cir. 1991); In re Iowa Railroad, 840 F.2d 535, 543 (7th Cir. 1988); Eggert v. Weisz, 839 F.2d 1261, 1263 n.1 (7th Cir. 1988).[1] Presently pending are cross

---

[1]The parties had more than adequate opportunity to address any issue they may have contested. Perhaps improvidently, the court granted each party's request to file oversized briefs. MSMC's briefs total 93 pages and Western

motions for summary judgment.

The contract between the parties (the "Agreement") is dated June 28, 1995 and was amended July 15, 1996. The Agreement provided for an initial term of six years and was to remain in force thereafter unless either party exercised a right to terminate by giving at least twelve months' notice to the other party. There is no dispute that, in October 1999, Western Union provided written notice to terminate the agreement at the end of the initial term. MSMC, however, contends that Western Union violated its duty to act in good faith in negotiating an extension of the Agreement and that the written notice of termination was ineffective. The Agreement has provisions regarding fees and commissions to be paid to MSMC for providing Western Union services to the public. There is also a provision that MSMC was to receive an upfront Acquired Location Allowance (the "Allowance") for each new "Acquired Location" it opened or acquired and at which it offered Western Union services. If such an Acquired Location offered Western Union services for less than 36 months, Western Union was entitled to a pro rata refund of the Allowance ("Allowance Refund"). A dispute exists regarding

Union's briefs total 70 pages. That does not include multiple and lengthy Local Rule 56.1 statements. The parties are admonished to henceforth judiciously edit any further briefs or memoranda and take the term "brief" more to heart.

whether Western Union was entitled to the Allowance Refund for locations that were open less than 36 months at the time the Agreement terminated. There is also a dispute concerning whether Western Union was entitled to the Allowance Refund when MSMC sold some Acquired Locations to Ace Cash Express, Inc. ("Ace") and Western Union would not allow Ace to continue to offer Western Union services at those locations. As to Acquired Locations sold to Ace, MSMC seeks the return of the Allowance Refunds it has already paid. MSMC also complains that Western Union wrongfully denied approval of a number of locations as Acquired Locations.

Western Union brings a five-count Second Amended Counterclaim. Most of the counts center on MSMC's alleged misappropriation of customer and transaction information related to MSMC's provision of Western Union services ("customer information"). Count I is labeled as a conversion claim based on MSMC's retention and use of the customer information. Count II is labeled as a fraud claim and is based on the allegation that MSMC falsely represented that it returned all customer information around the time the Agreement terminated. Count III is labeled as a trade secret misappropriation claim based on MSMC using the customer information to create a database used in soliciting customers to continue to use MSMC locations after the

Agreement terminated. After the Agreement terminated, MSMC locations offered money transfer services provided by MoneyGram Payments Systems, Inc. ("MoneyGram"), a competitor of Western Union. Count IV is labeled as a breach of contract claim and is broken into subclaims. Count IV(A) seeks the Allowance Refunds regarding the Acquired Locations that had not offered Western Union Services for 36 months at the time the Agreement terminated. Count IV(B) alleges the copying and use of customer information and certain financial information breached a provision of the Agreement. Count IV(C) seeks indemnity under the Agreement for $1800 in losses that Western Union allegedly incurred due to MSMC's failure to remit money transfers to the proper person. Count V is labeled as a set-off claim, seeking to set off the Allowance Refunds allegedly due against any damages MSMC may obtain on its claims.

Western Union moves for summary judgment dismissing MSMC's Second Amended Complaint in its entirety. Western Union also moves for summary judgment in its favor on the Count I conversion and Count IV(B) contract claims related to the customer information, as well as the Count IV(A) claim for the Allowance Refunds. MSMC moves for summary judgment dismissing all the counts of the Second Amended Counterclaim that concern customer information, that is, Counts I, II, III, and IV(B).

## II. SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002); Hilt-Dyson v. City Of Chicago, 282 F.3d 456, 462 (7th Cir.), cert. denied, 123 S. Ct. 97 (2002); Schneiker v. Fortis Insurance Co., 200 F.3d 1055, 1057 (7th Cir. 2000). The burden of establishing a lack of any genuine issue of material fact rests on the movant. Outlaw v. Newkirk, 259 F.3d 833, 837 (7th Cir. 2001); Wollin v. Gondert, 192 F.3d 616, 621-22 (7th Cir. 1999). The nonmovant, however, must make a showing sufficient to establish any essential element for which it will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Billings v. Madison Metropolitan School District, 259 F.3d 807, 812 (7th Cir. 2001). The movant need not provide affidavits or deposition testimony showing the nonexistence of such essential elements. Celotex, 477 U.S. at 324. Also, it is not sufficient to show evidence of purportedly disputed facts if those facts are not plausible in light of the entire record. See NLFC, Inc. v. Devcom Mid-America, Inc., 45 F.3d 231, 236 (7th Cir.), cert. denied, 515 U.S. 1104 (1995); Covalt v. Carey Canada, Inc., 950 F.2d 481, 485 (7th Cir. 1991); Collins v. Associated Pathologists, Ltd.,

844 F.2d 473, 476-77 (7th Cir.), <u>cert. denied</u>, 488 U.S. 852 (1988). As the Seventh Circuit has summarized:

> The party moving for summary judgment carries the initial burden of production to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." <u>Logan v. Commercial Union Ins. Co.</u>, 96 F.3d 971, 978 (7th Cir. 1996) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (citation and internal quotation omitted)). The moving party may discharge this burden by "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." <u>Celotex</u>, 477 U.S. at 325, 106 S. Ct. 2548. Once the moving party satisfies this burden, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The nonmovant must do more, however, than demonstrate some factual disagreement between the parties; the issue must be 'material.'" <u>Logan</u>, 96 F.3d at 978. "Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute." <u>Id.</u> (citation omitted). In determining whether the nonmovant has identified a "material" issue of fact for trial, we are guided by the applicable substantive law; "[o]nly disputes that could affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." <u>McGinn v. Burlington Northern R.R. Co.</u>, 102 F.3d 295, 298 (7th Cir. 1996) (citation omitted). Furthermore, a factual dispute is "genuine" for summary judgment purposes only when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Hence, a "metaphysical doubt" regarding the existence of a genuine fact issue is not enough to stave off summary judgment, and "the nonmovant fails to demonstrate a genuine issue for trial 'where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party . . . .'" <u>Logan</u>, 96 F.3d at 978 (quoting <u>Matsushita Elec.</u>

- 7 -

Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S.
574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538
(1986)).

Outlaw, 259 F.3d at 837.


### III. MSMC'S CLAIMS

Whether Western Union is entitled to summary judgment
dismissing the Second Amended Complaint will be considered first.
In ruling on those issues, all genuine factual disputes are
resolved and all reasonable inferences are drawn in MSMC's favor.

### A. TERMINATION AND NEGOTIATION

Section 17 of the Agreement provides:[2]

> This Agreement shall continue in force for an
> initial term of six years unless otherwise
> terminated as provided herein. Thereafter, this
> Agreement shall continue in effect subject to the
> right of either party to terminate it at the end
> of the six-year term or at any time thereafter
> upon the giving of at least twelve months' notice
> to the other party. . . . Agent [MSMC] shall
> have the option to extend this Agreement for an
> additional term of six years on terms to be
> mutually agreed between Western Union and Agent
> no less than six months before the end of the
> initial term hereof.

Early during the term of the Agreement, management
employees at Western Union were dissatisfied with the financial
terms of the Agreement. They were dissatisfied with the amount

---

[2]Section headings are omitted from all quoted Agreement
language because § 21 provides in part: "The headings are solely
for convenience and are not to be used in interpreting this
Agreement."

of the Allowance under the Agreement and certain guaranteed fees. As early as 1997, the parties discussed extending the Agreement. In a September 8, 1997 memorandum regarding "Contract Negotiations," a Western Union official stated "We are open to discussions regarding an extension of the agreement under revised economic terms and predicated on the inclusion of other Western Union products, namely Money Orders." In a March 1998 internal memorandum, the same official stated, "Extension through 2004 sounds good."

In a letter dated October 22, 1999, Western Union Chief Operating Officer Robert Albin sent MSMC President Jeffrey Silverman formal notice of termination under § 17. The text of the letter states in its entirety:

> Pursuant to Section 17 of the Agency Agreement, this letter will serve as Western Union's notice of the intent to terminate this Agreement upon the expiration of the initial term thereof.
> This termination notice does not preclude the possibility that a new Agency Agreement will be executed during the interim period before the expiration of the existing Agency Agreement. In fact, we look forward to beginning negotiations on a new, mutually beneficial agreement in the near future.

Prior to Silverman receiving the notice, Albin called him and told him that it was being sent because of a legal perspective, but he did not want it to interfere with discussions of a continuing relationship or renewal of the Agreement. In a conversation after Silverman received the notice, Albin told him he sent the notice for a technical reason.

Following a December 1999 meeting at which an extension
of the relationship was discussed, Mary Ann Fields of Western
Union sent Silverman a letter in which she stated: "Thank you
and Mark for taking time to meet with us to discuss your concerns
and the desire to continue our business relationship. We value
the relationship and would like it to continue as well."

Discussions as to continuing or renewing the Agreement
continued until February 2001. This included a July 19, 2000
letter from Western Union National Account Manager Fran Meyer to
Silverman in which she made reference to a Western Union offer
that MSMC had until August 31 to accept. She specifically
referenced confidentiality provisions of the Agreement as
applying to the ongoing negotiations. Additionally, she stated:
"If you elect not to accept our generous offer and execute a new
agreement by 8/31/00 extending your Western Union relationship,
we will consider notice as being given and proceed accordingly.
Our standard requirement for notice is 12 months and by 8/31/00
we will be well within that period."

Throughout the negotiations, Western Union made it clear
that it was unwilling to include an Allowance provision or
guaranteed commission levels or payments in any extension.
Western Union characterizes the negotiations as concerning a new
contract, not an extension, of the Agreement. To the extent it
is a material fact, on defendant's summary judgment motion,
evidence supporting that the negotiations were for an extension

must be taken as true.   In late 2000, the parties reached an
agreement in principle, but were unable to agree upon and execute
final written terms.   MSMC also points to evidence that, after
October 1999, Western Union continued to pay out the entire
Allowance for Acquired Locations even though it was less than 36
months before the expiration of the Agreement under the
termination notice.

On December 15, 2000, while negotiations were ongoing,
MSMC sent a letter purportedly invoking the extension option of
§ 17.   MSMC stated it was extending the term an additional six
years and that the existing terms of the Agreement were
acceptable to MSMC.

In 1999, unbeknownst to MSMC, Western Union began
negotiations with a major competitor of MSMC (the "Competitor").
In January 2001, MSMC first heard of the negotiations with the
Competitor and raised the issue with Western Union.   Western
Union would not confirm whether it was negotiating with the
Competitor.   MSMC had previously engaged in some negotiations
with MoneyGram and thereafter, on February 21, 2001, reached an
agreement in principle with MoneyGram and ended negotiations with
Western Union.   Western Union thereafter reached an agreement
with the Competitor, which now provides Western Union services in
Southern California, an area where MSMC formally provided
substantial Western Union services.   MSMC now uses MoneyGram's
services.

The parties do not contend there is any extrinsic evidence that would aid in construing the language of § 17.[3] The court must construe the meaning of this section as it applies to the facts assumed to be true for purposes of summary judgment.

The contract does not detail how the termination and option provisions of § 17 are to be applied.[4] Additionally, it does not expressly set forth how the termination and option provisions interplay. MSMC, though, implicitly concedes that, if there existed an effective invocation of termination as of December 15, 2000, its attempt to exercise the option was without effect. Instead, MSMC argues that the continuing negotiations and contemporaneous statements made Western Union's October 22, 1999 invocation of termination rights ineffective. If that argument has merit, it would also have to be determined what obligations Western Union had to negotiate "mutually agreed" extension terms and whether evidence sufficiently supports that it breached any such obligations.

_____

[3]MSMC presents evidence that the initial draft of the Agreement was boilerplate language provided by Western Union, but that the parties then negotiated changes to a number of provisions. As to § 17, the boilerplate term length was changed from five years to six years and the last sentence of the section, which is key to the parties' dispute, was a mutually negotiated addition to the boilerplate language. Cole Dep. at 161-62. As to the § 17 option provision, therefore, the rule cannot apply that ambiguities should be construed against Western Union as the drafter of the language.

[4]Section 20 of the Agreement contains general notice provisions requiring that the notice be in writing, listing the possible methods of delivery, and identifying the addresses to which notice is to be sent.

Under New Jersey law, every contract contains an implied
covenant of good faith and fair dealing. Wilson v. Amerada Hess
Corp., 168 N.J. 236, 773 A.2d 1121, 1126 (2001); Sons of Thunder,
Inc. v. Borden, Inc., 148 N.J. 396, 690 A.2d 575, 587 (1997).
Thus, "in every contract there is an implied covenant that
'neither party shall do anything which will have the effect of
destroying or injuring the right of the other party to receive
the fruits of the contract.'" Id. (quoting Palisades Properties,
Inc. v. Brunetti, 44 N.J. 117, 207 A.2d 522, 531 (1965) (quoting
Williston on Contracts § 670 at 159-60 (3d ed. 1961))). Accord
Wilson, 773 A.2d at 1126-27. Where, as in the present case, the
contract contains an unfettered right to terminate, the motive
for terminating is irrelevant. Thunder, 690 A.2d at 589-90;
Karl's Sales & Service, Inc. v. Gimbel Brothers, Inc., 249 N.J.
Super. 487, 592 A.2d 647, 651 (App. Div.), cert. denied, 127 N.J.
548, 606 A.2d 362 (1991). However, the party still must act in
good faith under the contract. Thunder, 690 A.2d at 588. For
example, the terminating party must continue to faithfully
perform under the contract until the actual termination date.
See id. at 587-88 (citing United Roasters, Inc. v. Colgate-
Palmolive Co., 649 F.2d 985 (4th Cir.), cert. denied, 454 U.S.
1054 (1981)). Also, the terminating party must act with good
faith and fair dealing in keeping the other party adequately
aware of its plans to terminate. It cannot encourage the other
party to expand or incur additional expenses where, unlike the
other party, the terminating party knows information that leads

- 13 -

it to believe actual termination is likely. See Thunder, 690
A.2d at 588 (citing Bak-A-Lum Corp. of America v. Alcoa Building
Products, Inc., 69 N.J. 123, 351 A.2d 349 (1976)). Additionally,
the implied covenant cannot override an express term in the
contract, but, unlike the law in some other states, New Jersey
recognizes a breach of the implied covenant can occur even if the
pertinent express term is not violated. Wilson, 773 A.2d at
1126.

The general rule is that, to be effective, a notice
terminating a contract must be clear and unequivocal. See 17B
C.J.S. Contracts § 446 (2002); Stovall v. Publishers Paper Co.,
284 Or. 53, 584 P.2d 1375, 1377-78 (1978); Todd v. Corporate Life
Insurance Co., 1990 WL 16430 *4 (N.D. Ill. Feb 15, 1990), aff'd
in part, rev'd in part on other grounds, 945 F.2d 204, 208 (7th
Cir. 1991); Accu-Weather, Inc. v. Prospect Communications, Inc.,
435 Pa. Super. 93, 644 A.2d 1251, 1254 (1994); Miller v. Crouse,
19 Ariz. App. 268, 506 P.2d 659, 664 (1973); In re Greater
Southeast Community Hospital Foundation, Inc., 267 B.R. 7, 18
(Bankr. Ct. D. Col. 2001). The focus is on whether the notice is
sufficiently clear to apprise the other party of the action being
taken. LA-Nevada Transit Co. v. Marathon Oil Co., 985 F.2d 797,
800 (5th Cir. 1993). The related conduct of the parties,
including conduct between the giving of notice and the actual
date of termination, may be considered in determining whether
there has been a clear and unequivocal termination. See Accu-
Weather, 644 A.2d at 1255; International Hobby Corp. v. Rivarossi

S.P.A., 1998 WL 376053 *6 (E.D. Pa. June 30, 1998), aff'd by
unpublished order, 203 F.3d 817 (3d Cir. 1999); Stovall, 584 P.2d
at 1380; Miller, 506 P.2d at 664.  The parties have not cited and
this court has not found any case law indicating that New Jersey
does not follow the general rule.  Cf. Upper Penns Neck
Township v. Lower Penns Neck Township, 20 N.J. Super. 280, 89
A.2d 727, 732 (Law Div. 1952) (where joint enterprise agreement
is silent as to termination and therefore terminal at will of
either party, "no particular form of notice of withdrawal is
necessary, it being sufficient that unequivocal acts or
circumstances are brought to the knowledge of other partners,
signifying a purpose to terminate the arrangement").

        Despite lengthy briefs, neither party has cited any cases
involving the question of whether a notice of termination was
sufficient and/or overridden by other communications or conduct.
In Dresser Industries, Inc. v. Pyrrhus AG, 936 F.2d 921 (7th Cir.
1991), Dresser provided notice of termination similar to that
involved in the present case in which Dresser clearly invoked the
termination clause of the parties' contract, but also stated that
it was willing to discuss a new form of relationship.  Unlike the
present case, it was also expressly stated that further
discussions would not limit the effect of the termination notice.
Prior to receipt of the notice, a Dresser employee orally
informed Pyrrhus to disregard the termination notice because
Dresser intended to continue the relationship on an expanded

basis.  The Seventh Circuit held:

> Pyrrhus fails to cite any case law for its
> proposition that a mere oral instruction to
> disregard a written termination makes the written
> notice of termination ineffective.  Moreover, the
> notice that Dresser intended to continue
> negotiating with Pyrrhus, but that "such
> discussions are not intended and do not limit
> this termination notice" (January 25, 1988
> termination letter) makes any reliance on the
> oral instruction objectively unreasonable.  Thus,
> we hold that Dresser terminated its Contract with
> Pyrrhus.

Id. at 930.[5]

In Stovall, supra, Stovall's attorney sent a letter to

Publishers specifically and clearly invoking the paragraph of a

contract permitting termination based on a breach by Publishers.

The letter goes on to state that Stovall was rejecting a prior

offer of compromise and was prepared to file suit, but would

consider further offers of compromise.  The letter continues on

by proposing specific modifications to the compromise and stating

"the foregoing is submitted in the interest of compromise and may

be accepted by written notice actually received" by a stated

date.  See Stovall, 584 P.2d at 1378-79.  The court stated that,

had the letter ended after rejecting Publishers' offer and

invoking the termination clause, it would have constituted a

clear and unequivocal invocation of the termination provision.

---

[5]At least one case has held that, where a contract
required written notice of termination, a written termination
notice may thereafter be modified or withdrawn orally.  See
Stauffer v. Westmoreland Obstetric & Gynecologic Associates,
S.C., 2003 WL 553622 *5 (N.D. Ill. Feb. 26, 2003).

However, because it also included an offer of compromise with a
stated response time, it was held that the purported termination
notice failed to satisfy the clear and unequivocal requirement.
Id. at 1379-81.

In Accu-Weather, the parties' contract automatically
renewed for two-year terms, but could be terminated by written
notice 120 days prior to the end of any term.  The then existing
term expired August 15, 1992.  On February 20, 1991, however, the
defendant gave the following written notice:

> This is to serve you notice to cancel our
> contract with you, effective 90 days from
> February 1, 1991 (our 1st conversation).
> Due to the reorganization of the station and
> market condition, we are forced to take this
> step, but at a later date, we may continue your
> services.

The plaintiff rejected the purported cancellation, citing the
termination provision of the contract and stating proper
notification would be required at the end of the existing term.
The defendant did not thereafter repudiate the contract as of
May 1, 1991 and instead continued to comply with the terms of the
contract.  On June 1, 1992, less than 120 days before the end of
the term, the defendant sent written notice of termination
effective at the end of the term, referencing the February 20,
1991 notice.  Id., 644 A.2d at 1252-53.  The court held that the
February 1991 notice was ineffective to terminate the contract as
of May 1991.  Id. at 1254-55.  As to a termination effective
August 1, 1992, the February 1991 notice was held to be

ineffectively ambiguous in that it did not refer to that date and also made reference to possibly continuing at a later date. Additionally, the defendant's continued performance was found to be inconsistent with a clear intent to terminate the contract. Id. at 1255. The court, however, held that a factual dispute precluded summary judgment for the plaintiff because a factual dispute existed regarding whether the defendant had provided adequate oral notice that the February 1991 notice would be effective at the end of the term. Id. at 1255-56.[6]

The situation in the present case is not on all fours with Dresser, Stovall, or Accu-Weather. The first sentence of Western Union's October 22, 1999 letter clearly invokes the termination provision of the contract and expressly states Western Union's "intent" to terminate, which is a clear statement of termination. Cf. Dresser, 936 F.2d at 930; Stovall, 584 P.2d at 1378, 1379; Maloney v. Madrid Motor Corp., 385 Pa. 224, 122 A.2d 694, 696 (1956). Consistent with Dresser, indicating in the letter that further discussions would continue and reaching an agreement was a "possibility" did not prevent the letter from being a clear and unequivocal invocation of the termination provision effective at the end of the initial term. But compare Accu-Weather, 644 A.2d at 1255. Similar to Dresser, at the time

---

[6]The court held oral modifications or waivers of the writing requirement or time requirements were possible. Accu-Weather, 644 A.2d at 1255. Courts are split as to whether oral notice of termination can suffice when the contract requires written notice. See C.J.S. Contracts § 446 & nn. 52-53.

the termination notice was sent, oral statements were made disclaiming an actual intent to terminate, though not clearly modifying or withdrawing the notice as in Stauffer, 2003 WL 553622 at *5. Such statements were made both immediately before and shortly after the notice was received by MSMC. However, the pertinent facts do not stop there. Between the giving of the notice in October 1999 and the end of 2000, Western Union made repeated oral and written statements indicating that it intended to continue the parties' relationship beyond the initial term. This included Fields' July 19, 2000 letter that is ambiguous as to whether Western Union considered a notice of termination to be outstanding.[7] There is sufficient evidence on which a jury could find that a clear and unequivocal invocation of the termination clause did not exist as of the second half of 2000, if not other times as well. On defendant's summary judgment motion, it must be assumed that an effective termination notice was not in place.

Since, on the facts assumed to be true, there was no effective notice of termination as of December 2000, MSMC had the right to invoke the § 17 extension option as it did on December 15, 2000. That clause provides that MSMC "shall have

_____

[7]MSMC also relies on the continued payment of full Allowances even though the contract purportedly would terminate in less than 36 months. However, under the contract, Western Union was required to make full payment and seek reimbursement at the time the Acquired Location ceased providing Western Union services. Compliance with the terms of the contract is not conduct inconsistent with an intent to terminate. Cf. International Hobby, 1998 WL 376053 at *6.

the option to extend this Agreement for an additional term of six years on terms to be mutually agreed between Western Union and Agent no less than six months before the end of the initial term hereof." As Western Union stresses, this option is to be on terms mutually agreed by the parties. Generally, every word in a contract, however, is to be accorded some effect. Cumberland County Improvement Authority v. GSP Recycling Co., 358 N.J. Super. 484, 818 A.2d 431, 438 (App. Div. 2003); AXA Assurance, Inc. v. The Chase Manhattan Bank, 339 N.J. Super. 22, 770 A.2d 1211, 1214 (App. Div. 2001); Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 63 (1995); Restatement (Second) of Contracts § 203(a) (1981). It must be recognized, that the extension is an "option" on the part of MSMC. While Western Union certainly could not be required to accept any terms demanded by MSMC, the fact that it is MSMC's option implies some duty of conciliation on Western Union's part. It should also be recognized that MSMC offered to extend on the existing terms of the Agreement, terms upon which the parties had previously been able to mutually agree.[8] In any event, it is certainly clear that, at a minimum following MSMC's exercise of the option, Western Union had to engage in a good faith effort to reach a mutual agreement as to terms. Cf. Union Electric Co. v.

---

[8]It is recognized that the clause is written in the future tense: "to be mutually agreed." Therefore, it cannot be read as absolutely requiring Western Union to accept an extension based on the existing terms of the Agreement.

<u>Consolidation Coal Co.</u>, 188 F.3d 998, 1001 (8th Cir. 1999).
Additionally, although MSMC gave notice of the option just less
than two weeks before the six-month deadline for reaching a
mutual agreement,[9] the parties had already been engaged in
substantial negotiations.

There is evidence to support that Western Union did not
act in good faith in seeking to reach a mutual agreement. First,
it took more than two months to respond in writing to MSMC's
invocation of the option. Western Union's absolute refusal to
consider including an acquired location allowance or guaranteed
commissions in the extended agreement could be found to be a
failure to act in good faith. Also, Western Union's negotiations
with the Competitor while MSMC retained and invoked the extension
option, as well as Western Union's refusal to answer questions
about negotiations with the Competitor could be found to be a
failure to act with good faith and fair dealing. <u>Cf.</u> <u>Bak-A-Lum</u>,
351 A.2d 349.[10]

For the foregoing reasons, genuine factual disputes
remain as to whether Western Union violated its duty to act with

---

[9]The clause is not clearly written as to the deadline,
but the better reading would be that the mutual agreement is to
be reached before the six-month deadline, not merely that MSMC
invoke the option before the deadline.

[10]Even if the termination notice had been effective and
therefore MSMC no longer had the right to exercise the option,
some or all of this conduct could still be found to be a
violation of Western Union's continuing duty to act with good
faith until the Agreement expired.

good faith and fair dealing in negotiating to extend, renew, or replace the Agreement.

## B. FAILURE TO APPROVE NEW LOCATIONS

Section 4 of the Agreement provides in part:

> Agent and Western Union agree that all additional locations of Agent, whether newly opened or acquired, will be included as locations under this Agreement as soon as reasonably possible after opening or acquisition as the case may be, subject to Western Union's prior approval.

After October 1999, MSMC proposed 71 new locations of which Western Union rejected 40. At to all 40 rejections, MSMC contends Western Union did not act with good faith and fair dealing. MSMC places the rejections in four categories: 16 Nationwide locations, 15 National Check Cashers locations, 6 Advance America locations, and 3 Pratts locations.

The facts assumed to be true for purposes of Western Union's summary judgment motion on this claim are as follows. As of June 28, 1995, MSMC had 109 locations. From then until October 1999, MSMC opened or acquired 117 new locations at which it offered Western Union services. Western Union did not reject any of the new locations.[11] During this approximate time period, Western Union did not go through any approval process for a new location. MSMC would inform Western Union of a new location and

---

[11]Prior to October 1999, there were a few disputes as to whether relocations qualified for the Allowance, but no instances of Western Union rejecting a proposed location as a place to offer Western Union services.

Western Union would thereafter go through the mechanics to set up the Western Union services. From 1995 through 2001, Western Union itself also substantially expanded the number of agents it had in North America, increasing the number of agents by approximately 1000 per year from 1995 through 1998, 3000 in 1999, 3500 in 2000, and 6800 in 2001.

In November 1998, Albin became the Chief Operating Officer of Western Union North America. He soon became concerned about the Allowances paid under the Agreement and that the Agreement contained no limit on MSMC's expansion. He decided that Western Union should limit MSMC's expansion during the remaining initial term and negotiate new terms for when the initial term expired. On September 24, 1999, Western Union informed MSMC that it would need 30 days' notice of new locations and that locations would not be considered part of the Agreement until actually approved by Western Union. In December 1999, Western Union informed MSMC that, if it provided advance notice of an acquisition, Western Union would try to have approval in place by the time the acquisition closed. MSMC thereafter complied with this request.

In November 1999, for the first time under the Agreement, Western Union declined to approve certain new locations. By September 2000, Western Union had declined to approve 40 of 71 proposed new locations. There is more than sufficient evidence for a jury to find that Western Union was motivated by a desire to avoid paying further Allowances and that the Allowances were

considered in deciding whether to approve new locations.  The
employees evaluating the new locations were instructed to conduct
very thorough reviews and document their decisions.  As to 15
Nationwide locations, the local Market Development Manager was
instructed to:  "Please review <u>very</u> thoroughly and get back to me
by Monday as to which stores we <u>do not</u> want in the St. Louis
market."  Employees had not previously been instructed to conduct
very thorough analysis or specifically to identify locations that
were not wanted.

In the letter initially rejecting 20 of 35 proposed
Nationwide locations, Western Union stated its decision as to the
20 "locations is based largely on the fact there are existing
Western Union agent locations in close proximity to [those]
locations which offer excellent service, such as extended hours
and high levels of encashment, to our customers in those areas."
Proximity to other cash checkers was given for rejecting certain
Advance America locations.  As to placing kiosks in three Pratts
grocery store locations, Western Union denied approval on the
ground that Pratts already offered Western Union services in the
store and two locations in the same store were unnecessary.[12]  As
to the National Cash Checkers locations, MSMC never made an
actual bid while it awaited possible approval by Western Union,
which never provided a response.  There is evidence that other

---

[12]Apparently, MSMC's intention would have been for Pratts
to stop offering Western Union services at its customer service
counter.

locations were opened that were as close in proximity to other
Western Union agents as the rejected MSMC locations.

As to the National Cash Checkers and Pratts locations,
Western Union contends it had no obligation to consider approval
of those locations until after MSMC had actually acquired the
locations. Section 4, however, does not specify the timing for
approval, other than that it be prior to the Agreement applying
to the location. Section 13(I) provides in part that MSMC
"agrees to provide Western Union with timely notice of the
acquisition of its new Acquired Locations in order to facilitate
the activation of such locations for the provision of Western
Union services." Approval before closing an acquisition would
constitute "prior approval" and notice prior to closing an
acquisition would also be timely. Contrary to Western Union's
contention, the language of the Agreement does not preclude
approval prior to closing an acquisition. There being no
specification in the contract, reasonable, good faith notice and
reasonable, good faith responses would be required. Moreover,
once Western Union insisted on enforcing the prior approval
requirement, it informed MSMC that it would try to approve
proposed acquisitions prior to the closing of the acquisition.
As long as MSMC provided sufficient advance information, Western
Union had to act reasonably and in good faith in providing its
approval or disapproval.

As to the National Check Cashers locations, Western Union
represented to MSMC that it was engaging in its due diligence

considerations, but the evidence shows that Western Union never began its due diligence process. Western Union contends that MSMC's possible acquisition of the National Check Cashers locations never reached a sufficient stage of negotiations for Western Union to begin consideration. That, however, remains an issue of fact. As to the Pratts locations, Western Union responded that it would not approve two Western Union providers within the same location even though MSMC's intention was to replace the Western Union services being provided by Pratts employees.

MSMC contends that violation of the duty of good faith and fair dealing can be found based on (a) Western Union being motivated by a desire to avoid paying Allowances; (b) special instructions to more thoroughly examine the requests and look for locations to deny; and (c) explanations for denials that are inconsistent with the actual facts. Western Union contends (a) it was entitled to act in its financial interest in considering the costs of the Allowance as part of its financial analysis; (b) emphasizing documentation was reasonable in light of the possibility of litigation between the parties; and (c) MSMC ignores that factors other than proximity were considered so that two locations with the same proximity to other Western Union locations might be treated differently because of the other factors.

Under § 4 of the Agreement, Western Union had unilateral authority to approve new locations. In such a situation, "[a]

good faith performance doctrine may be said to permit the exercise of discretion for any purpose--including ordinary business purposes--reasonably within the contemplation of the parties. It follows, then, that '[a] contract thus would be breached by a failure to perform in good faith if a party uses its discretion for a reason outside the contemplated range--a reason beyond the risks assumed by the party claiming the breach.'" Wilson, 773 A.2d at 1127 (quoting Steven J. Burton, Breach of Contract & the Common Law Duty to Perform in Good Faith, 94 Harv. L. Rev. 369, 386 (1980)). See also Shree Ganesh, Inc. v. Days Inns Worldwide, Inc., 192 F. Supp. 2d 774, 784 (N.D. Ohio 2002). The party's discretion must be exercised reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the expectations of the parties. Wilson, 773 A.2d at 1128. Still, the party's right to exercise discretion based on its own reasonable beliefs concerning business strategy must be recognized; there is no breach unless the party acts with an improper motive. Id. at 1130.

During the first four plus years of the Agreement, Western Union approved every new location proposed by MSMC. It approved these locations even though it was not happy with the Allowance and guarantees it had to pay MSMC. There is no contention that business dynamics changed in late 1999 such that expansion was less attractive. To the contrary, Western Union continued to expand at an even greater rate in 1999, 2000, and 2001. Nevertheless, on the facts that must be assumed to be true

for purposes of Western Union's summary judgment motion, starting in late 1999, Western Union was less willing to approve new locations for MSMC. On summary judgment, it must be taken as true that the locations that were rejected did not have a reasonable justification for being distinguished from locations that had previously been approved or locations that were still being approved for MSMC and other agents. Instead, it is reasonable to infer that Western Union was making approval more difficult in order to avoid paying the Allowances and guarantees. The legal question, though, is whether that is a legitimate and reasonable business motive or an improper motive under New Jersey's common law as to the implied covenant of good faith and fair dealing.

On the evidence before the court, it cannot be assumed to be true that the proposed locations were expected to be unprofitable for Western Union, only that they might be less profitable than if opened by other agents who had agency agreements with terms less favorable to the agent. Was it improper for Western Union to be motivated by such considerations? That question cannot be answered in a vacuum, but must be considered in light of the expectations of the parties under the Agreement. The Agreement contained no specific limit on MSMC's ability to expand; only Western Union's discretionary approval power. One of the "fruits" of the contract for MSMC was the ability to expand and receive Allowances and guaranteed payments. It is reasonable to infer

from the terms of the Agreement that it was not anticipated that MSMC would be discriminated against because its Allowance terms were more favorable than other agents. Being more stingy in the approval of MSMC's new locations in order to avoid payment of the Allowance and guaranteed commissions is an improper motive in the parties' relationship.[13] In addition to actual rejections, this applies to failing to timely and reasonably respond to requests for approvals, if also motivated by seeking to avoid paying the Allowance and guaranteed commissions.

MSMC's claims based on the alleged bad faith or unfair rejection of new locations will not be dismissed.

## C. REJECTION OF THE ASSIGNMENT TO ACE

The second and third paragraphs of § 13(I) of the Agreement provide:

> Further, in the event an Acquired Location is sold or otherwise transferred by Agent, Agent agrees that it shall assign, and shall require the purchaser or transferee of such Acquired Locations, as a condition precedent to such sale or transfer, to agree to assume Agent's obligations hereunder to offer the Services at such Acquired Location for a period of three (3) years from the date on which such acquired location was activated for the provision of the Services pursuant to this Agreement or until June 30, 2000, whichever is longer. If Agent complies with the terms set forth in this section said location(s) will not be subject to a prorata pay back provision. Nothing in the foregoing,

---

[13]Since such facts are not before the court, no opinion is expressed regarding whether it would be an improper motive if Western Union had rejected locations because it projected the locations as unprofitable for it by taking into account MSMC's Allowances and guaranteed commissions.

however, shall be deemed to limit Western Union's rights to approve any assignment of this Agreement pursuant to Section 19 hereof.

Notwithstanding anything contained in the foregoing to the contrary, in the event that Agent (and/or any permitted assignee or transferee of Agent in accordance with the immediately preceding paragraph and Section 19 hereof) for whatever reason (other than a default by Western Union hereunder) does not offer the Services at any Acquired Location for a minimum of thirty-six (36) consecutive months in accordance with the terms of this Agreement, Western Union shall be immediately entitled, upon the termination of any one or more of the Services at such Acquired Location, to demand repayment of a prorata portion of the Acquired Location Allowance not earned for such Acquired Location pursuant to the following formula: The Acquired Location Allowance shall be multiplied by a fraction, the numerator of which shall be the number of months the Acquired Location offered Money Transfer Services, and the denominator of which shall be thirty-six (36).

Section 19 provides in its entirety:

This Agreement may not be assigned or transferred by Agent without the prior written consent of Western Union. Agent agrees to give Western Union no less than 60 days' notice of any proposed assignment, transfer or change of name of Agent's principal business with which the Western Union Agency business is associated. For purposes of this Section, any change in control of Agent shall be deemed to be an assignment. This Agreement will inure to the benefit of Western Union, its successors and assigns.

The last sentence of § 21 of the Agreement provides:[14]

Neither party shall have the authority to make any agreement or commitment, or incur any

---

[14]None of the copies provided of this page of the Agreement are very easy to read and the first few characters of two lines appear to have been cut out by a hole punch, but the language stated in the text appears to be accurate.

> liability on behalf of the other, nor be
> liable for any acts or omissions of the
> other, except as otherwise specifically
> provided herein.

In October 2000, MSMC sold 107 of its locations to Ace.
Most of those centers had offered Western Union Services.
Approximately 44 of the locations were Acquired Locations and
approximately 40 of them had offered Western Union Services for
less than 36 months. As to 15 of the locations, Ace agreed to
assume MSMC's obligations to Western Union and offer Western
Union services through December 31, 2001. Western Union refused
to permit Ace to offer Western Union services at the 15
locations. Western Union then demanded that MSMC pay $756,863 in
Allowance Refunds for the 40 locations. Under pressure, MSMC
paid the full amount. MSMC contends it should not have been
required to pay $237,495 of the Allowance Refunds, which
represents a portion of the Allowance Refunds related to the 15
locations where Ace had agreed to continue to offer Western Union
services.[15] MSMC contends it did not owe $237,495 of the
Allowance Refunds because, as to the 15 locations, it fully
complied with the assignment requirement of § 13(I). It contends

---

[15]The Second Amended Complaint alleges that $237,495 is
the damages related to this claim. 2d Am. Compl. ¶¶ 59-60,
76(e). In its answer to the summary judgment motion, MSMC refers
to seeking return of the entire $756,863 of Allowance Refunds.
MSMC Memo. in Opposition [65] at 35. That apparently is a
mistake. MSMC makes no argument as to why it would not have been
required to pay the Allowance Refunds for the other 25 locations.

that this provision applies regardless of whether Western Union approves the assignee. To the extent Western Union's approval is required for the assignment provision to be effective, MSMC contends Western Union wrongfully rejected Ace.

MSMC contends § 19's assignment provision applies to the assignment or transfer of the Agreement, not to the assignment or sale of a particular Acquired Location. Section 13(I) was jointly negotiated, whereas § 19 is essentially unchanged form language drafted by Western Union. See Cole Dep. at 162.[16] The last sentence of § 21 apparently was also form language of Western Union. See id. at 152, 162-63.[17] Thus, any ambiguity in § 19 or the last sentence of § 21 should be strictly construed against Western Union as the author of the language. Kotkin v. Aronson, 175 N.J. 453, 815 A.2d 962, 963 (2003) (quoting In re Miller's Estate, 90 N.J. 210, 447 A.2d 549, 555 (1982)).

As a general rule, in the absence of an express contractual prohibition, the rights and obligations under a contract may be assigned or delegated. Aronsohn v. Mandara, 98 N.J. 92, 484 A.2d 675, 679 (N.J. 1984); J.H. Renarde, Inc. v. Sims, 312 N.J. Super. 195, 711 A.2d 410, 412-13 (Ch. Div. 1998);

---

[16]Cole testified that the only change from the form was the number of days for the notice. That aspect of § 19 is not at issue.

[17]Cole testified that § 21 on the copy of the Agreement shown to him was difficult to read due to poor duplication, but he did not believe there were any changes to the standard language of the last sentence.

Restatement (Second) of Contracts §§ 317, 318 (1981).  There is
no contention by Western Union that public policy should limit
MSMC's ability to assign its rights and obligations as to
particular locations providing Western Union services nor is
there any contention that MSMC's obligations could not be
delegated because Western Union had a substantial interest in
performance by MSMC itself.  Thus, unless the Agreement provides
otherwise, MSMC was free to delegate to Ace its obligations to
provide Western Union services at the 15 locations at issue.

Notwithstanding a grammatical or punctuation error in the
last sentence of § 21, that sentence apparently provides neither
party shall have the authority to make an agreement or commitment
on behalf the other except as provided for in the Agreement.
Whether this would be clear enough to prohibit MSMC's delegation
of its obligation to provide Western Union services at particular
locations, cf. Owen v. CNA Insurance/Continental Casualty Co.,
167 N.J. 450, 771 A.2d 1208, 1218 (2001), need not be decided
since there is a provision of the Agreement that permits
delegation of that obligation.  It is noted, though, that § 21
itself contains no general requirement that approval be obtained
for any assignment or delegation.

Section 19 contains a requirement of prior written
consent before MSMC may assign or transfer the "Agreement."  The
notice provision of § 19 refers to the assignment, transfer, or
change of name of the "principal business . . . with which the
Western Union Agency business is associated."  No express

reference is made to the assignment or transfer of a location. The principal business referenced in § 21 is MSMC located in Northbrook, Illinois. The locations do not operate under that name and the address in Northbrook, Illinois is not one of the locations where Western Union services are offered. Section 4, which concerns locations, does not have a provision expressly referring to the assignment, transfer, or sale of locations. It does refer to the "change" of a location as requiring 30 days' notice and Western Union's written consent. A sale that ends Western Union services at that location could be considered a change of location.[18] Thus the reference to assignment or transfer of the principal business should be understood to be a reference to an assignment, transfer, or sale of MSMC, not an assignment, transfer, or sale of a specific location. Such a reading is consistent with the plain language of § 19 referring to the assignment or transfer of the "Agreement" and no reference to assignment or transfer of a location. Additionally, to the extent § 19 is ambiguous and thus could possibly be read as applying to assignments or transfers of locations, it must be strictly construed against Western Union, which drafted this language. Section 19 will not be read as applying to the sale of locations.

---

[18]The written consent provision of § 4 would not have applied to the sale of the 15 locations to Ace since Western Union services were to continue at those locations after the sale, thus, no change of location offering services.

Of course, the references to § 19 that are contained in § 13(I) must be considered. Omitting, for the moment, consideration of the last sentence of the second paragraph of § 13(I), that paragraph provides that MSMC may sell or transfer an Acquired Location and delegate to the transferee its obligations to provide Western Union services at the location. There is no requirement that MSMC obtain Western Union's approval of the transferee. In light of this provision and the previously set forth construction of § 19, the last sentence of this paragraph should be understood as distinguishing § 19 from the other provisions of the paragraph. The last sentence makes clear that the language allowing MSMC to transfer locations and obligations without prior approval does not in any way limit the requirement that an assignment of the overall Agreement requires Western Union's written consent as set forth in § 19.

Still to be considered is language in the third paragraph of § 13(I). That paragraph refers to "Agent (and/or any permitted assignee or transferee of Agent in accordance with the immediately preceding paragraph and Section 19 hereof)." Western Union contends that the reference to a "permitted assignee or transferee" makes clear that its permission is required for an assignment or transfer. However, the use of the word "permitted" is not limited to referencing permission by a party. It also is understood as meaning permitted by the Agreement, that is, an assignee or transferee as permitted by ("in accordance with") paragraph two of § 13(I) ("the immediately preceding paragraph").

Thus, the third paragraph refers to assignees and/or transferees permitted by the second paragraph and/or permitted (written consent) by Western Union in accordance with § 19.

The Agreement itself did not require that MSMC obtain Western Union's approval of the entity to which it sold or transferred an Acquired Location. Except to the extent provided in the Agreement or consented to by Western Union, delegating its obligations did not discharge MSMC's duty. Fusco v. City of Union City, 261 N.J. Super. 332, 618 A.2d 914, 916-17 (App. Div. 1993); Restatement (Second) of Contracts § 318(3) (1981). MSMC does not dispute that it had to provide a transferee that was "ready, willing, and able to continue providing Western Union Services." MSMC Memo. in Opposition [65] at 36. Ace had provided Western Union Services at a number of locations until March 2000. As of October 2000, Ace was the largest agent for MoneyGram, Western Union's largest competitor. The relationship between Ace and Western Union was terminated because Albin had had a bad experience with Ace when Albin was at MoneyGram and because Western Union did not want to do business with an entity that was MoneyGram's largest agent. Western Union continued to permit Ace franchisees to be Western Union agents. At the time it consummated the sale to Ace, MSMC was aware of Western Union's policy against providing Western Union services at Ace-owned locations.

Western Union does not contend that Ace was unable to perform the duties it was willing to assume. Instead, Western

Union contends Ace was not an entity it was willing to approve.
Since the parties do not address the legal issues involved, the
court will not resolve questions of whether Ace's relationship
with MoneyGram makes it an unqualified candidate that does not
satisfy MSMC's obligation to provide an able replacement or
whether selling to an entity that MSMC knows Western Union will
not do business with is violation of MSMC's duty to act with good
faith and fair dealing in meeting the transfer requirements of
§ 13(I). As to MSMC's claim that it is entitled to the return of
Allowance Refunds it has paid, Western Union's summary judgment
motion will be denied.

### D. LOST PROFITS

As to the new locations that were not approved by Western
Union and the alleged breach of not negotiating an extension with
good faith and fair dealing, MSMC's prayer for damages includes
lost profits. Western Union contends any such damages are barred
by provisions contained within sections 10 and 11 of the
Agreement. Those sections provide in their entirety (emphasis
added):

> 10. Any other provisions of this Agreement
> or of law notwithstanding, (A) Agent assumes full
> responsibility and liability for all monies,
> including, without limitation, Money Transfer
> principal and fees, received in connection with
> the provision of the Services or under this
> Agreement by Agent, its employees or agents (the
> "Western Union Funds") and all Western Union
> Money Transfer checks received by Agent, its
> employees or agents, and agrees to hold Western
> Union harmless from any claims, losses, damages,
> liabilities, or expenses due to or arising out of
> loss, misuse, theft, burglary, forgery, robbery

or other crime, destruction, mysterious
disappearance and all other similar or dissimilar
causes of loss with respect thereto (including,
without limitation, the receipt of counterfeit
currency or bank cashiers' checks or deposit to
the wrong bank account); (B) Agent assumes full
responsibility for the consequences of Agent's
failure to adhere to the Service Requirements
(including, without limitation, any payments of
Money Transfers to other than the intended
recipients, in excess of the authorized amount,
or resulting from Agent's failure to mark the
transaction as paid out in the "Will Call File");
(C) Agent agrees to hold the Western Union Funds
in trust as a fiduciary for the sole and
exclusive use and benefit of Western Union and to
account therefor separately and apart from all
other funds of Agent and agrees that, in the
event agent commingles Western Union Funds with
any other funds, such other funds shall be
impressed with a trust to the extent of the
Western Union Funds; and (D) Agent agrees to pay
all Western Union Funds to Western Union upon
demand regardless of the presence or absence of
negligence of Agent. <u>Except as otherwise
provided herein, neither party shall be liable to
the other for any indirect, incidental, special
or consequential damages.</u> Agent will provide to
Western Union annually, promptly after the close
of Agent's fiscal year, financial statements for
the year just ended, including any income
statement and a year-end balance sheet, certified
by Agent's independent auditors or otherwise as
may be acceptable to Western Union.

    11. Each party shall indemnify and hold the
other harmless from and against any claims,
losses, damages, liabilities or expenses
(including reasonable attorneys' fees) ("Losses")
as follows. Western Union will indemnify Agent
against Losses arising out of claims or actions
concerning mishandling, delays, non-delivery or
other errors or omissions concerning the Services
and caused by Western Union prior to transmission
to Agent or after acceptance from Agent and not
attributable to the acts or omissions of Agent or
its employees or agents. Agent will indemnify
Western Union against Losses arising out of the
acts or omissions of Agent or its employees or
agents, in connection with Agent's performance in
providing the Services under this Agreement,
including without limitation, any losses

> attributable to Agent's failure to comply with
> the provisions of the Service Requirements.
> <u>Except as otherwise provided herein, neither
> party shall be liable to the other for any
> indirect, incidental, special or consequential
> damages.</u>

The language of section 11 is form language drafted by
Western Union. <u>See</u> Cole Dep. at 151. To the extent there is any
ambiguity, the language in this section should be strictly
construed as against Western Union. The underlined language in
§ 10 was added during negotiations and the last sentence of § 10
may have been modified from the form language. <u>See id.</u> at 151,
155-56; MSMC Response App. Exh. 87 (MSMC 006280).

Under New Jersey law, limitation of liability clauses are
enforceable if "they do not adversely affect the public interest,
where the exculpated party is not under a public duty to perform,
as in the case of a public utility or common carrier, and where
the contract does not grow out of unequal bargaining power or is
otherwise unconscionable." <u>Tessler & Son, Inc. v. Sonitrol
Security Systems of Northern N.J., Inc.</u>, 203 N.J. Super. 477, 497
A.2d 530, 532 (App. Div. 1985). <u>See also</u> <u>Marbro, Inc. v. Borough
of Tinton Falls</u>, 297 N.J. Super. 411, 688 A.2d 159, 162 (Law Div.
1996) (applying Pennsylvania law, but also discussing New Jersey
law). Unless clear and unambiguous, limitations of liability
clauses are to be strictly construed. <u>Abel Holding Co. v.
American District Telegraph Co.</u>, 147 N.J. Super. 263, 371 A.2d
111, 114 (App. Div. 1977); <u>Midland Carpet Corp. v. Franklin
Associated Properties</u>, 90 N.J. Super. 42, 216 A.2d 231, 234 (App.

Div. 1966). _But see_ _Blue Sky MLS, Inc. v. RSG Systems, LLC_, 2002 WL 1065873 *3 & n.5 (D.N.J. March 28, 2002).[19]

The two identical clauses relied upon by Western Union must be read in context. Each is contained within a particular section of the Agreement each of which concerns specific types of liability. Neither clause contains express language making it generally applicable to the entire Agreement. Each refers to "[e]xcept as otherwise provided herein." The more reasonable reading of "herein" would be as a reference to the particular section within which the clause is contained, not as a reference to provisions in other parts of the contract.[20] Thus, each limitation of liability should be understood as only applying to the particular section within which it is contained. Moreover, construing either clause as being generally applicable to the Agreement would render the other meaningless because, if one of the clauses applies to the entire Agreement, there would be no

---

[19]_Blue Sky_ indicates that the strict construction rule applies to exculpatory clauses that protect a party from all liability and not to actual limitation of liability provisions. _Abel_, however, involved a limitation of liability.

[20]Although not fully consistent, the Agreement generally uses the term "hereunder" to refer to provisions contained in another section of the Agreement.  _See_ Agreement §§ 8(A)(iii), 13(C), 13(F), 13(I), 20.  Section 17 uses "herein" to refer to a provision in that section itself.  Subsection 13(I) uses "herein" to refer to a provision in another subsection of § 13, that is, subsection 13(G).  Section 14 uses "hereunder" both ways and § 21 uses "herein" both ways.

need to have the other.[21] The limitation of liability clauses relied upon by Western Union must be understood as applying only to liability under the sections in which they are contained. Since MSMC's claims are not based on breaches of these sections, the limitation of liability clauses do not apply to MSMC's claims.

Western Union also contends that it is entitled to summary judgment on any claim for lost profits because MSMC does not have sufficient evidence to support such a claim. It contends that it cannot be shown that MSMC would have actually purchased certain Nationwide, National Check Cashers, and Pratts locations if Western Union had approved them for the provision of Western Union services. However, there is evidence that the Allowances and income from providing Western Union services were considerations for the purchases. A genuine factual dispute exists as to causation.

## IV. WESTERN UNION'S COUNTERCLAIM

### A. ALLOWANCE REFUNDS

In Count IV(A) of its Second Amended Counterclaim, Western Union contends it is entitled to Allowance Refunds for

---

[21]It would also be contradictory to read the clauses as stating that there are no consequential damages, etc. anywhere in the contract except as set forth in ("herein") the sections in which the clause is contained. If read in that manner, the limitation of liability in § 10 would eliminate any consequential damages, etc. in § 11 and the limitation of liability in § 11 would eliminate any consequential damages, etc. in § 10 leaving no such damages even though the clauses state exceptions.

those Acquired Locations that had provided Western Union services less than 36 months at the time the parties' relationship terminated. The parties do not dispute as to which stores offered services less than 36 months nor apparently do they dispute the amount of the Allowance Refunds that would be due. However, MSMC raises two grounds as to why summary judgment in Western Union's favor should be denied as to this claim. Since Western Union is seeking summary judgment on this claim, all genuine factual disputes are to be resolved in MSMC's favor in ruling on this claim.

Section 13(I) of the Agreement, as amended, provided that, upon termination of services at an Acquired Location, Western Union would be "immediately entitled . . . to demand" payment of any Allowance Refund that may be due. Without citation to any authority, MSMC contends Western Union is not entitled to any Allowance Refunds because it did not satisfy this "demand" requirement prior to filing suit. Case law, however, supports that any demand requirement is satisfied by the filing of a lawsuit. Leary v. Gledhill, 8 N.J. 260, 84 A.2d 725, 727-28 (1951). Failure to make a demand is not a basis for denying summary judgment.

MSMC's other ground is a sufficient basis for denying summary judgment. Western Union is entitled to an Allowance Refund when, in less than 36 months, services are terminated "for whatever reason (other than a default by Western Union hereunder)." Western Union does not dispute that termination of

services resulting from the breach of its duty to act with good faith and fair dealing in negotiating a contract extension would constitute a "default" as that term in used in § 13(I). As is discussed in § III(A), supra, disputed factual issues exist regarding whether Western Union committed such a breach. Therefore, Western Union is not entitled to summary judgment as to Count IV(A) of its Second Amended Counterclaim.

## B. CUSTOMER INFORMATION

MSMC moves for summary judgment dismissing all the counterclaims based on customer information. Western Union seeks summary judgment in its favor on two of those claims, Counterclaims I and IV(B). Unless otherwise noted, the facts set forth below are undisputed facts applicable to each party's motion for summary judgment. Where there are genuine factual disputes, the different facts that must be assumed to be true for each party's motion will be expressly noted.

Sections 7 and 8 of the Agreement provide in part:

> 7.   Records with respect to Western Union's customers, including customer lists and other customer information, and records relating to transactions of the Services are the property of Western Union. Such records are subject to audit and review by Western Union at any time during normal business hours. . . .
> 8.   (A) Agent shall make no use or disclosure, other than for purposes of its performance under this Agreement or as may be required by law, of (i) security identifications . . .; (ii) Western Union's customer information including, without limitation, names and credit card numbers; (iii) volumes, revenues, earnings, commission rates or payments hereunder; or (iv) other confidential information with respect to Western

Union, the Services, this Agreement, or the
relationship between the parties.
    (B) Agent agrees not to divulge to any third
party the existence of terms of the Local
Marketing Support, the Guaranteed Commissions
. . ., the Acquired Location Allowance . . ., or
the Acquired Location Allowance Advance . . . .

Section 18 of the Agreement provides in part:

    . . . Immediately upon termination of this
Agreement, . . . (B) Agent will no longer be
entitled to enjoy the benefits of the patronage
of Western Union's customers attracted to Agent's
premises and will make no use of Western Union's
customer lists or of information with respect to
Western Union's customers; . . . (E) Agent will
deliver to Western Union . . . all copies of all
information and records with respect to Western
Union's customers, transactions of the Services
or Western Union's security measures and
procedures, regardless of the form or media in
which such records exist; . . . .

On February 21, 2001, MSMC reached an agreement in

principle to use MoneyGram services upon the expiration of the

initial term of the Agreement. The written agreement with

MoneyGram was executed on April 13, 2001. In March 2001, MSMC

began accumulating information about its customers, including

customers who both had or had not used Western Union services.

Western Union transaction forms were used in accumulating some of

this information. In early April 2001, a marketing agency was

retained to develop a customer list. The marketing agency was

provided copies of Western Union transaction forms to use in

completing the customer list. MoneyGram suggested the marketing

agency that was used and, in July 2001, paid the marketing

agency's fee. The day after the Agreement terminated in June

2001, MSMC used the customer list to send a mailing notifying customers about MSMC's change of wire transfer providers. The mailing also included information about MSMC services that had not been the ones offered through Western Union.

All of Western Union's agents have agreements with confidentiality provisions similar to those contained in the Agreement. Western Union also provides manuals to its agents that address the issue of the confidentiality of customer information. Any customer information that is obtained directly from the customer is obtained by the agents, not Western Union. Western Union does not provide customer lists to its agents. As to all agents whose agreements are terminated, Western Union requests the return of all Western Union customer records as is provided in the agency agreements. MSMC represented to Western Union that it returned all customer records upon termination of the Agreement. It is undisputed that MSMC retained the customer list that was created and included data about customers who had purchased Western Union services. It is also undisputed that MSMC returned all original Western Union transaction forms. MSMC did not inform Western Union that it had provided copies of the forms to the marketing agency. The copies of the forms were destroyed by the marketing agency, not retained.

It is undisputed that MoneyGram was aware that a customer list was being developed and that a mailing would be made. It is also undisputed that, on April 4, 2001, MSMC provided MoneyGram with the amount of gross commissions and bonuses it earned from

Western Union in 2000 for each of 42 core locations. The information provided did not include the volumes for those locations nor how the commissions or bonuses were calculated.

Genuine factual disputes exist regarding MoneyGram's participation in the development of the customer list. On MSMC's motion, it must be assumed that (a) MoneyGram actively participated in the decision to create a customer list; (b) MoneyGram actively participated in the development of the customer list; and (c) some of the payments made to MSMC under its agreement with MoneyGram were based on MoneyGram knowing MSMC had access to the Western Union customer information and MoneyGram's knowledge of commissions and bonuses MSMC received from Western Union. On Western Union's motion, it must be assumed that (a) the decision to create a customer list was an independent decision of MSMC; (b) independently of MoneyGram, MSMC controlled the customer list development process; and (c) MoneyGram agreed to MSMC's compensation before learning of MSMC's intention to create a customer list.

### 1. COUNT IV(B)--BREACH OF CONTRACT

The Count IV(B) contract claim will be considered first. In this count, Western Union alleges three related, but distinct, breaches. Western Union contends that (1) the customer list, including the use of the Western Union transaction forms and their disclosure to the marketing agency, breached sections 7, 8(A)(ii), and 18(B); (2) disclosing the gross commissions and bonuses to MoneyGram breached § 8(A)(iii); and (3) failure to

return the copies of transaction forms made for the marketing agency breached § 18(E).

The undisputed facts do not show any breach of § 18(E). By its own language, that section applies only to records that "exist." Even without such language, the provision would not be read as requiring the return of records that do not exist.[22] Since the copies used by the marketing agency were destroyed, there was nothing further to return. MSMC did not breach § 18(E) and that aspect of Count IV(B) will be dismissed.

New Jersey law has recognized that a business entity may have a legitimate interest in its proprietary and confidential information and its customer relationships. Ingersoll-Rand Co. v. Ciavatta, 110 N.J. 609, 542 A.2d 879, 894 (1988); Platinum Management, Inc. v. Dahms, 285 N.J. Super. 274, 666 A.2d 1028, 1038 (Law Div. 1995). "[T]o be judicially protected, misappropriated information need not rise to the level of the usual trade secret, and indeed, may otherwise be publicly available. The key to determining the misuse of the information is the relationship of the parties at the time of disclosure, and its intended use." Id. Accord Meadox Medicals, Inc. v. Life Systems, Inc., 3 F. Supp. 2d 549, 552 (D.N.J. 1998). However, New Jersey law does not automatically enforce every restriction

_____

[22]This is not a situation where Western Union may have lost the value of having the records for its own use. Only copies were destroyed; MSMC provided the originals to Western Union.

on competition that parties have agreed upon and included in a written contract. "Noncompetition agreements are looked upon unfavorably by the courts, as potential restraints on trade." Maw v. Advanced Clinical Communications, Inc., 359 N.J. Super. 420, 820 A.2d 105, 113 (App. Div. 2003). To be enforceable, the restrictive covenant must be reasonable under the circumstances. Id.; Ingersoll-Rand, 542 A.2d at 887; Platinum Management, 666 A.2d at 1037; Meadox, 3 F. Supp. 2d at 552.

In an employment contract, post-employment restrictions on competition must satisfy a three-prong test to be enforceable: the restrictions "must be reasonably necessary to protect the employer's legitimate interests, must not cause undue hardship on the employee and must not impair the public interest." Platinum Management, 666 A.2d at 1037. Accord Maw, 820 A.2d at 113. The same general rule has been applied to a nonemployee contractual relationship in which the restricted party was a sophisticated entity that acted as an independent distributor for a manufacturer. See Meadox, 3 F. Supp. 2d at 552 & n.2.

A business may not use a restrictive covenant to protect customer information that it did not, either directly or indirectly, assist in developing. Id. at 553; Coskey's Television & Radio Sales & Service, Inc. v. Foti, 253 N.J. Super. 626, 602 A.2d 789, 794-95 (App. Div. 1992). Here, Western Union had no direct contact with the customers at MSMC locations. Under § 2(A) of the Agreement, MSMC was responsible for advertising and promoting Western Union services so as to develop

customer interest and confidence. Based on the 109 MSMC locations in operation in June 1995, § 2(B) required that Western Union provide $50,000 to $100,000 per year of local marketing support, with adjustments to be made for increases in the number of locations. The Agreement refers to MSMC being required to participate in national promotions. Western Union, however, has presented no evidence as to the marketing it may have engaged in during the time period of the Agreement nor the effect any Western Union advertising had on attracting customers to MSMC's locations. On the evidence before the court, it can only be found that MSMC was primarily responsible for attracting customers to its locations. It must also be found that Western Union had at least some indirect effect on attracting customers.

In Meadox, the independent (and exclusive in its territory) distributor of a manufacturer's medical products was entirely responsible for attracting and developing customers. Also, the parties' contract in that case did not expressly state that either party had a proprietary interest in customer information. However, the manufacturer could not have access to the customer information collected by the distributor unless it promised to keep it confidential. The court found that, if either party had a proprietary interest in the customer information, this implied that the distributor did. Primarily based on these facts, the court held that a covenant that prohibited the distributor from selling competitive products for one year after the termination of the relationship was

unenforceable because the manufacturer lacked a protectable interest in the customer information it sought to protect.  See Meadox, 3 F. Supp. 2d at 553-54.

The facts in the present case are different from those in Meadox.  Here, it must be inferred that Western Union made some contribution to attracting customers.  However, it was primarily the responsibility of MSMC and customers were primarily obtained through MSMC's efforts.  Also, it was entirely through MSMC's efforts that any customer information was collected.  Unlike Meadox, here the parties' Agreement expressly states that records of Western Union customer transactions are the property of Western Union.  Here, it cannot be found that Western Union had no possible protectable interest in the customer information.  However, Western Union's minimal participation in developing customers must still be taken into account in balancing the interests involved.

In addition to taking into account Western Union's minimal contribution to the development of customers, it must be considered that the customer list (which is the primary basis for any harm suffered by Western Union based on customer information) includes many who were MSMC customers, but did not use Western Union services.  Also, most of the Western Union customers also purchased non-Western Union services from MSMC.  Further, this is not a situation where the locations are Western Union stores.  The locations have signage showing that they provide Western Union services, but the business name is something different.

Also, it must be considered that this is a retail business that relies on volume to be successful. While there may be a number of repeat customers, this is not the type of situation where the restricted entity has fewer customers and more well-developed relationships with individual clients. Neither was any special skill or equipment or contribution from Western Union needed to collect the customer information. Additionally, to a substantial extent, the customer base at a particular location may be largely determined by convenience of location to the customer's home, employment, or other place frequently visited. This is not the type of situation where it is appropriate to restrict MSMC from using information with respect to customers who used Western Union services, even if that information was collected on Western Union forms that the contract identifies as property of Western Union. Section 18(B) of the Agreement will not be enforced based on use "of information with respect to Western Union's customers" nor will MSMC be prohibited from continued patronage of customers who had previously used Western Union services.

Still to be considered is the claimed violation of § 8(A)(iii), which prohibits MSMC from making use of or disclosing the "volumes, revenues, earnings, commission rates or payments hereunder." Expressly excepted from this prohibition are uses or disclosures for purposes of performance under the Agreement or as may be required by law. There is no evidence

that MSMC disclosed volumes or commission rates.[23]  In its
discussions with MoneyGram, however, it is undisputed that MSMC
disclosed gross commissions and bonuses of $1,250,000 for the
year 2000 for 42 core locations.  For those same 42 locations,
MoneyGram agreed to pay MSMC a "guaranteed minimum payment" of
$1,250,000 annually for the first three years of their agreement.
The disclosure of gross commissions and bonuses would be the
disclosure of revenues, earnings, or payments under the
Agreement.  MSMC contends that it must share revenue and
commission information with potential lenders, investors, buyers,
and government agencies and therefore the information is not
confidential information that was expected to be undisclosed
under the Agreement.

In ¶ 33 of its Local Rule 56.1(a)(3) statement,[23] MSMC
states:  "Like the customer information used to develop the
Customer List, information about the commissions earned by MSMC
is also readily available to MSMC.  MSMC must share such revenue
information with potential investors and lenders.  It must advise
potential MSMC financial service center buyers of the financial
results of its business operations.  MSMC is required by law in

---

[23]The deposition testimony of Eugene Schott that is cited
by Western Union does not establish that any commission rate or
volume data was actually disclosed.  Schott refers to the
commission rates of MoneyGram.  See Schott Dep. at 52.  Although
one question was asked Schott assuming that volumes had been
disclosed, Schott did not actually testify that volumes were
disclosed.  See id. at 108.

[23]Docket Entry [67].

certain states to publicly disclose its revenues, fees, and
commissions, including the fees and commissions it receives from
Western Union." In support of this factual contention, MSMC
cites one conclusory paragraph from Silverman's affidavit. It is
doubtful that Silverman's affidavit meets the summary judgment
requirement of providing specific facts and he cannot testify as
to the legal requirements of state law. Additionally, the
affidavit does not identify which states require disclosures nor
what the disclosures are. However, MSMC's statement is to be
taken as true unless adequately controverted by Western Union.
See N.D. Ill. Loc. R. 56.1(b)(3)(B). Merely expressing
disagreement with an asserted fact without providing any citation
to materials supporting a dispute or stating why the moving
party's statement is deficient will leave the asserted fact
admitted. See Traum v. Equitable Life Assurance Society of
United States, 240 F. Supp. 2d 776, 780 (N.D. Ill. 2002). In
response to ¶ 33, Western Union purports to dispute the
allegations by incorporating its responses to four other
paragraphs and by quoting language from § 8(A)(iii). None of the
incorporated responses, however, address the issue of required
disclosures to lenders, investors, buyers, or government
agencies. Therefore, the second two sentences of ¶ 33 must be
deemed admitted. However, which states actually require
disclosures and the specific disclosures required are left in
dispute.

To the extent any revenue or earnings data is publicly available because it must be disclosed to a state regulatory agency, its disclosure to MoneyGram will not be found to be a breach because MoneyGram could have otherwise obtained the information through the public sources. MSMC's required disclosures to lenders, investors, and buyers is not a basis for disclosing to MoneyGram because MoneyGram was none of the three. Also, disclosures to buyers, as well as disclosure to a new service provider such as MoneyGram, are not disclosures for the purpose of performance under the Agreement. Since the parties do not provide any details as to what disclosures are required by law, neither side is entitled to summary judgment based on whether or not the commission and bonuses disclosures to MoneyGram breached the Agreement.

MSMC also contends it is entitled to summary judgment based on Western Union's inability to prove any damages resulting from the disclosures. Factual disputes exist as to that issue.

Count IV(B) will be dismissed except to the extent it is based on disclosures of commissions and bonuses earned from Western Union.

## 2. COUNT III--TRADE SECRETS MISAPPROPRIATION

Western Union bases its Count III trade secrets misappropriation claim on the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065. Under ITSA,

> (d) "Trade secret" means information, including but not limited to, . . . list of actual or potential customers or suppliers, that:

> (1) is sufficiently secret to derive
> economic value, actual or potential, from
> not being generally known to other persons
> who can obtain economic value from its
> disclosure or use; and
> (2) is the subject of efforts that are
> reasonable under the circumstances to
> maintain its secrecy or confidentiality.

765 ILCS 1065/2(d). See also Delta Medical Systems v. Mid-America Medical Systems, Inc., 331 Ill. App. 3d 777, 772 N.E.2d 768, 780 (1st Dist.), appeal denied, 201 Ill.2d 564, 786 N.E.2d 182 (2002).

It need not be decided whether the customer list, which was created by MSMC not Western Union and which contained information MSMC could have gathered directly from its customers without using the Western Union transaction forms, constitutes a trade secret under ITSA. See id. at 781; Unisource Worldwide, Inc. v. Carrara, 244 F. Supp. 2d 977, 986 (C.D. Ill. 2003). Even if the customer list or transaction forms could constitute a trade secret, it must also be shown that misappropriation occurred. Delta, 772 N.E.2d at 780; Unisource, 244 F. Supp. 2d at 990 n.7; Nilssen v. Motorola, Inc., 963 F. Supp. 664, 679 (N.D. Ill. 1997). In the present situation, misappropriation would have to be based on disclosure of confidential information that, because of its relationship with Western Union, MSMC had a duty not to disclose. 765 ILCS 1065/2(b)(2)(B)(II); Nilssen, 963 F. Supp. at 679 (quoting American Antenna Corp. v. Amperex Electronic Corp., 190 Ill. App. 3d 535, 546 N.E.2d 41, 44 (2d

Dist. 1989)); <u>Roton Barrier, Inc. v. Stanley Works</u>, 79 F.3d 1112, 1118 (Fed. Cir. 1996).

Where the parties have a contractual relationship that defines the duty of nondisclosure, the contract defines that duty for purposes of misappropriation under ITSA. <u>Nilssen</u>, 963 F. Supp. at 680. As is discussed in § IV(B)(1), <u>supra</u>, MSMC did not breach the Agreement in creating the customer list or disclosing the Western Union transaction forms. Since such conduct did not breach the parties' contract, it cannot constitute misappropriation under ITSA. <u>See id.</u>; <u>Unisource</u>, 244 F. Supp. 2d at 986, 989-90. MSMC is entitled to summary judgment dismissing Count III of the Second Amended Counterclaim.

### 3. COUNT I--CONVERSION

In Count I of the Second Amended Counterclaim, Western Union alleges that MSMC wrongfully converted Western Union's customer and transaction information. Under Illinois law, "conversion is any unauthorized act that deprives a person of his or her or its property permanently or for an indefinite time. To establish a conversion claim, a plaintiff must establish that (1) it has a right to the property; (2) it has an absolute and unconditional right to the immediate possession of the property; (3) it made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over its property." <u>Turner Investors v. Pirkl</u>, ___ Ill. App. 3d ___, ___ N.E.2d ___, 2003 WL 1900919 *3 (3d Dist. April 15, 2003).

The undisputed facts establish that, as required by the § 18(E) of the Agreement, MSMC provided the transaction forms to Western Union and all copies were destroyed. There can be no conversion claim based on MSMC's alleged retention of the transaction forms. Neither can there be any claim based on using the transaction forms to create the customer list. As is discussed in § IV(B)(1), _supra_, MSMC's use of the forms did not breach the parties' Agreement. Therefore, Western Union cannot show that MSMC wrongfully exercised control or dominion over the transaction forms. MSMC is entitled to summary judgment dismissing Count I of the Second Amended Counterclaim. Western Union's motion for summary judgment as to liability on Count I will be denied.

### 4. COUNT II--FRAUD

In Count II of the Second Amended Counterclaim, Western Union alleges that MSMC committed fraud in that it falsely represented that all the transaction forms had been returned to Western Union. The undisputed facts are to the contrary. MSMC is entitled to summary judgment dismissing Count II of the Second Amended Counterclaim.

### V. CONCLUSION

Western Union's motion for summary judgment will be denied. None of the claims contained in the Second Amended Complaint will be dismissed. MSMC's motion for summary judgment will be granted in part and denied in part. Counts I, II, and

III of the Second Amended Counterclaim will be dismissed in their entirety. Count IV(B) of the Second Amended Counterclaim will be dismissed except to the extent it is based on a violation of § 8(A)(iii) of the parties' Agreement.

In today's opinion the parties' Agreement has been construed and a number of rulings have been made, both of which result in a narrowing of the issues remaining between the parties. A very complicated set of facts would have to be presented to a jury for the resolution of disputed factual issues. The contractual relationship between the parties terminated approximately two years ago. All that remains is a question of monetary damages; no issues of injunctive relief or a continuing relationship exist. In light of today's ruling, the two sophisticated entities that are involved in this litigation should be able to examine their possibilities of success or failure and the possible ranges of damages that could be awarded. The parties should reasonably reach a financial settlement of their claims against each other.

By no later than July 1, 2003, MSMC shall serve a written demand for settlement upon Western Union. Western Union shall respond within one week after the demand is served. A status hearing will be held for the parties to report on the possibility of settlement.

IT IS THEREFORE ORDERED that defendant-counterplaintiff's motion for summary judgment [54] is denied. Plaintiff-counterdefendant's motion for summary judgment [66] is granted in

part and denied in part.  Second Amended Counterclaim Counts I,
II, and III, and Count IV(B) (except for the claim based on
§ 8(A)(iii) of the parties' agreement) are dismissed.  Status
hearing set for July 23, 2003 at 11:00 a.m.

ENTER:

_____
UNITED STATES DISTRICT JUDGE

DATED:  JUNE *19* , 2003